UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
West Palm Beach Division

Case No. 26-cv-81587

Bruce Crawford, as Trustee for the ABCD Trust,

Plaintiff,

v.

JPMorgan Chase Bank, N.A.,

Defendant.
_______________________________________/

**COMPLAINT**

Plaintiff, Bruce Crawford, as trustee of the ABCD Trust, sues Defendant, JPMorgan Chase Bank, N.A., and alleges:

**THE PARTIES**

1. Plaintiff Bruce Crawford ("Plaintiff"), as trustee for the ABCD Trust (the "Trust"), is an individual, a citizen of Florida residing in Palm Beach County, and is *sui iuris*.

2. Defendant JPMorgan Chase Bank, N.A. ("Chase") is a national banking association. Its main office, as designated in its articles of association, is in Columbus, Ohio, and Chase is therefore a citizen of Ohio.

3. Chase operates branches and conducts business throughout Florida, including in Palm Beach County, and it opened and maintained in Florida the accounts described in this Complaint.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because Plaintiff is a citizen of Florida, Chase is a citizen of Ohio, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. This Court has personal jurisdiction over Chase because it operates, conducts, engages in and carries on a business in Florida, maintains branches and customer accounts in Florida, and committed the acts alleged in this Complaint in connection with accounts it opened and maintained in Florida. Plaintiff's claim arises from those activities.

6. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Chase is subject to personal jurisdiction in this District and therefore resides here for venue purposes. A substantial part of the events giving rise to Plaintiff's claim occurred in Palm Beach County, where Plaintiff resides. The Trust's account at Wells Fargo Bank, from which the Trust's funds were taken, was kept and serviced at a Wells Fargo branch in Palm Beach County. The financial advisor whose e-mail system the Hacker used to divert the funds is located there. And the account to which Chase sent the Trust's funds on July 24, 2023 was a lawyer's trust account in Palm Beach County.

## RELATED ACTIONS

7. This action arises from the same scheme, and in part from the same transfers, as two earlier actions in this District: *Crawford v. Doe and Truist Financial Corporation*, No. 9:25-cv-80270-DMM, in which Plaintiff sued the bank that received the Trust's funds and transmitted them to Chase, and *Donnelley v. Doe and JPMorgan Chase Bank, N.A.*, No. 9:24-cv-80945-DMM, in which two other victims of the same scheme sued Chase over funds the same Hacker stole from them in the same way, which passed through Truist accounts of the same person and into a second

Chase account at the same address as the account at issue here. Both actions have concluded. Plaintiff's action against the persons who received the Trust's funds, *Crawford v. Cadena, et al.*, No. 50-2026-CA-004358-XXXA-MB, is pending in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida.

## GENERAL ALLEGATIONS

***The Theft.***

8. In July 2023, Plaintiff was in the process of investing Trust funds through CBK Financial Solutions, LLC ("CBK"), a financial advisory firm in Palm Beach County, Florida, one of whose principals, Kyle McFadden ("Mr. McFadden"), was Plaintiff's point of contact at the firm.

9. An unknown person or persons (the "Hacker") had gained unauthorized access to CBK's e-mail system, intercepted CBK's communications with its clients, and sent CBK's clients fraudulent messages from Mr. McFadden's e-mail account.

10. On July 12, 2023, Plaintiff received three e-mails from Mr. McFadden's account stating that CBK's bank account had been placed "on hold" and attaching "updated" wire instructions for an account at Truist Bank ("Truist") that the instructions represented to be CBK's.

11. The Hacker sent those e-mails.

12. The Truist account identified in the wiring instructions sent by the Hacker did not belong to CBK. Rather, it was an account ending in 3233 held in the name of Cutler Bays Italian Mens Suits Inc. ("Cutler Bays"), a company owned and controlled by Edward Cadena ("Cadena").

13. On July 13, 2023, relying on the instructions, Plaintiff wired $450,000 of the Trust's funds to the Cutler Bays account at Truist from the Trust's account at Wells Fargo Bank, N.A. ("Wells Fargo"), which was kept and serviced at a Wells Fargo branch in Palm Beach County.

14. On July 14, 2023, Cadena, in person at a Truist branch in Miami-Dade County, signed and directed a wire of $360,000 from the Cutler Bays account to an account ending in 7365 at Chase in the name of Oceanview Real Estate LLC ("Oceanview"), whose address was 1441 Brickell Avenue, Suite 1018, Miami, Florida, with the stated purpose "REAL ESTATE INVESTMENT" (the "July 14 Wire").

15. The $360,000 was the Trust's money.

16. Chase received the July 14 Wire and credited it to the Oceanview account the same day. Chase's own record of the wire identifies the originator as "CUTLER BAYS ITALIAN MENS SUITS INC, 20446 S DIXIE HWY, CUTLER BAY FL 33189-1212," the sending bank as Truist, the purpose as "REAL ESTATE INVESTMENT," and the beneficiary as "OCEANVIEW REAL ESTATE LLC, 1441 BRICKELL AVE STE 1018, MIAMI FL."

17. Before the July 14 Wire, the Oceanview account held $30,465.59. After it, the account held $390,450.59.

18. From July 14 until the afternoon of July 24, 2023, the Trust's funds made up substantially the entire balance of the account.

19. Neither Plaintiff nor the Trust had any dealings with Cadena, Cutler Bays, Oceanview or anyone acting for them, and none of them had any claim to the Trust's funds.

***Oceanview and Carnoustie: Two Chase Accounts under One Operation.***

20. Oceanview is a Florida limited liability company organized in May 2022. Its account at Chase was opened at Chase's Brickell Avenue branch on July 29, 2022, by Diego Fernando Gomez Fabbrizzi as its sole signer, with the address 1441 Brickell Avenue, Suite 1018.

21. Chase's account opening file identifies no member or owner of Oceanview.

22. Carnoustie Real Estate LLC ("Carnoustie") is a Delaware limited liability company. Its account at Chase, ending in 5991, was opened in October 2021 by Ariel Augusto Scornik as its sole signer.

23. By 2023, Chase's records carried the same address for Carnoustie as for Oceanview, 1441 Brickell Avenue, Suite 1018.

24. Chase's own records showed that the two accounts funded each other. Between February and May 2023, money moved between them in amounts up to $199,000 per transaction, never with a stated purpose.

25. Moreover, money was moved to whichever account had a payment to make.

26. For instance, on July 7, 2023, Oceanview sent Carnoustie $55,000, and Carnoustie paid $39,881.15 to a bank in Spain the same day from a balance that had stood at $15,009.40 the day before.

27. Three days later, on July 10, 2023, Carnoustie sent Oceanview $50,000, and Oceanview wired $200,000 to a lawyer's trust account the same day.

28. Chase's own records showed that the two accounts dealt with the same counterparties.

29. In June 2023, within four days, Carnoustie wired $725,000 and Oceanview wired $215,000 to the same account at PNC Bank in the name of GBAM Securities Ltd of the British Virgin Islands.

30. Carnoustie wired $310,000 to the trust account of a Miami lawyer, Alvaro Castillo B., P.A., in March 2023, and Oceanview wired $200,000 to the same trust account on July 10, 2023.

31. Both accounts wired funds to Iberian Investments LLC of Aventura, Florida, Carnoustie earlier in 2023 and Oceanview on July 19, 2023.

32. Chase's fraud analysts documented that wire transfers initiated from both accounts between June 5 and July 13, 2023, originated from the same Internet Protocol ("IP") address.

33. Chase's fraud analysts identified the IP address as being located in Uruguay, outside the geographic location of either registered account holder, and determined that its use "cannot be justified."

34. On June 5, 2023, Carnoustie initiated a wire transfer of $46,290. Chase's analysts could not confirm the recipient's ownership of the receiving account, found that the telephone number on file did not return to Carnoustie, and heard nothing from the customer for three days.

35. On June 8, 2023, Chase declined the wire.

36. On June 9, 2023, Oceanview then sent a wire in the same amount, $46,290, to Pareadas Siriu SPE Ltda at Banco do Brasil in São Paulo, Brazil, described as a real estate purchase, and Chase approved it.

37. Neither account showed the activity of an operating business. Neither paid rent, payroll or vendors. Each received wires from individuals, companies and payment services, many of them abroad, and sent wires abroad, to the trust accounts of lawyers and title companies, and to other companies and individuals in Florida and elsewhere.

38. The two accounts moved money for other people. Wires out of the accounts paid for apartments, closings and obligations of persons named in the wire references who were not the account holders.

39. Chase's own analysts recorded this. On June 14, 2023, the Chase fraud analyst who reviewed a $98,400 Carnoustie wire to a title company recorded the wire's memo, "ANTONIO

WAISSMAN PARA LA COMPRA DEL DEPTO EN 31 SE 6TH ST 2107," a payment for a third person's purchase of an apartment, and recorded that the wire had been initiated from the Uruguayan IP address whose use "cannot be justified."

40. Whoever controlled one account controlled the other. Chase's own records showed that Oceanview and Carnoustie had the same address, funded each other, dealt with the same counterparties, were operated from the same foreign internet IP address, and moved a payment from one account to the other when Chase declined it. They were one operation under common control, and Chase's records showed it.

***The Second Theft and the July 20 Wire to Carnoustie.***

41. The Hacker used the same method on other CBK clients. On July 17, 2023, the Hacker sent two of them, Patricia Donnelley and Douglas Stockham, "updated" wire instructions for an account at Truist ending in 6109 that the instructions represented to belong to "CBK Group 10, LLC." The instructions gave Truist's address as 20446 S. Dixie Highway.

42. The account belonged to Real Estate Investments in the USA LLC ("REI"), another company owned and controlled by Cadena.

43. On July 19, 2023, Ms. Donnelley wired $400,000 from her account at First Horizon Bank ("First Horizon") to the REI account.

44. The same day, Mr. Stockham wired $80,000 from his account at SouthState Bank to the REI account.

45. On July 20, 2023, Cadena, again in person at a Truist branch in Miami-Dade County, directed a wire of $432,000 from the REI account to Carnoustie's account at Chase, again with the stated purpose "REAL ESTATE INVESTMENT" (the "July 20 Wire").

46. The $432,000 consisted of funds taken from Ms. Donnelley and Mr. Stockham.

47. Chase's own record of the July 20 Wire identifies the originator as "REAL ESTATE INVESTMENTS IN THE USA, 20446 S DIXIE HWY, CUTLER BAY FL 33189-1212," the sending bank as Truist, the purpose as "REAL ESTATE INVESTMENT," and the beneficiary as "CARNOUSTIE REAL ESTATE LLC, 1441 BRICKELL AVE STE 1018, MIAMI FL."

48. The originator address and the beneficiary address are the same addresses that appear in Chase's record of the July 14 Wire.

49. The theft of the Trust's funds and the theft of Ms. Donnelley's and Mr. Stockham's funds were two parts of one scheme.

50. The same Hacker used the same compromised e-mail system to divert both into Truist accounts of the same person at the same address, and the proceeds of both were wired, six days apart, into Chase accounts at the same address under the same stated purpose.

51. Cadena was also Chase's customer. On July 17, 2023, three days after the July 14 Wire and three days before the July 20 Wire, REI opened a business checking account at Chase's Kendall Square branch in Miami, Florida, with Cadena as its sole authorized person and 20446 S. Dixie Highway as its address.

52. The originator of the July 20 Wire, as recorded by Chase, was therefore Chase's own customer, REI, by name and by address.

53. Chase's own customer file identified Cadena, by name, as the person at 20446 S. Dixie Highway, the originator address on both wires.

54. No real estate investment existed. Neither the Trust nor Ms. Donnelley nor Mr. Stockham had agreed to any investment, and none of them had any dealings with Cadena, his companies, Oceanview or Carnoustie.

55. On July 24, 2023, four days after the July 20 Wire, Cadena issued a one-page letter on REI's letterhead vouching for the July 20 Wire as a private investment in real estate whose payment "was coordinated to be deposited at the CHASE BANK Account of CARNOUSTIE REAL ESTATE LLC."

56. The letter names no property, no contract, no price and no terms.

57. Carnoustie submitted Cadena's letter to Chase in support of its request that Chase release the $432,000.

58. In the state action, Cadena has admitted that the July 14 Wire and the July 20 Wire were made at the direction of the Hacker, whom he describes as a real estate investor from Uruguay, and Cadena has produced no document reflecting any actual real estate investment.

59. Likewise, in the state action, Carnoustie has produced no document of any investment to which the July 20 Wire related other than Cadena's letter.

***The Theft of the Trust's Funds Is Discovered and Reported.***

60. Plaintiff discovered the fraud on July 20, 2023, when Mr. McFadden followed up with him about the wire that CBK was still waiting to receive from the Trust.

61. Plaintiff learned of the fraud first and informed the other victims. From July 20, 2023, the victims acted together, and what they and their banks learned about the thefts was conveyed to Truist and, through First Horizon and Truist, to Chase.

62. That afternoon, Mr. McFadden reported the fraud to the manager of Truist's Worth Avenue branch in Palm Beach.

63. That day, Plaintiff reported the theft to Wells Fargo, which opened a fraud claim on the Trust's wire.

64. By that evening, Truist had identified the Trust's $450,000 wire, the July 14 Wire and the July 20 Wire as transfers through accounts belonging to Cadena, and had closed the Cadena accounts to debits.

65. On July 20 and 21, 2023, Plaintiff reported the theft to Truist.

66. Truist told Plaintiff that it had already wired the stolen funds to accounts at other banks and that part of the Trust's funds had gone to an account at Chase.

67. Truist told Plaintiff that it was in communication with Chase about the Trust's funds and that it had instructed the banks holding the funds to freeze them.

68. On July 21, 2023, Wells Fargo sent Truist a request for the return of the Trust's $450,000 as fraud.

***The Fraud Report to Chase and Chase's Fraud Finding.***

69. On July 20, 2023, after Ms. Donnelley reported the fraud to her bank, First Horizon's Vice President of Corporate Security and Senior Risk Investigator, Eileen Lam, contacted Truist's financial-crimes unit, identified the July 19 wire of $400,000 as a business-email-compromise fraud, and asked Truist to lock the receiving account.

70. Truist informed Ms. Lam that it had already wired $432,000 out of that account to Carnoustie's account at Chase.

71. That afternoon, Ms. Lam reported the fraud to Chase's fraud department and identified the July 20 Wire into Carnoustie's account as carrying the proceeds of the theft from her bank's customer.

72. On information and belief, Ms. Lam described the fraud to Chase as she had described it to Truist that day, as a business-email-compromise fraud.

73. Chase acted on the report the same day and a Chase fraud analyst entered a fraud judgment on Carnoustie's account stating "WRONGDOER / INCOMING WIRE FROM FIRST HORIZON BANK IS FRAUDULENT / DO NOT RELEASE FUNDS / CITE BIC / RISK TO THE BANK."

74. Chase's fraud-alert system recorded that entry under the disposition "Fraud – Judgment," not as a pended alert.

75. Chase restricted Carnoustie's account against all transactions the same day.

76. Ms. Lam's report concerned the $400,000 taken from Ms. Donnelley. The restriction held the entire $432,000 in the account, $32,000 more than the loss Ms. Lam had reported.

77. Chase entered the fraud judgment in its fraud-alert system, which records, for each account, every alert and the notes of the analysts who reviewed it, and which can be searched by account and by customer profile.

78. The same fraud unit, using the same system, reviewed the July 24 Wire described below, while the fraud judgment and the restriction it had entered on Carnoustie's account remained in force.

79. The wire Chase judged fraudulent was the July 20 Wire described in paragraph 47, from the originator at 20446 S. Dixie Highway, through Truist, under the label "REAL ESTATE INVESTMENT," to the beneficiary at 1441 Brickell Avenue, Suite 1018.

80. That stated purpose, "REAL ESTATE INVESTMENT," was the one Cadena had given six days earlier for the July 14 Wire.

81. On July 21, 2023, Chase generated a closure letter for Carnoustie's account and opened its own investigation of the July 20 Wire.

82. On July 24, 2023, Chase's anti-money-laundering function recorded that Carnoustie's account had been identified for closure by Chase's client-escalations team, that the client was not to be given any information, and that every closure and disbursement restriction placed by other Chase teams was to be checked before any funds were disbursed.

83. From the afternoon of July 20, 2023, Chase therefore knew that a wire from a Truist customer at 20446 S. Dixie Highway, labeled "real estate investment," into an account at 1441 Brickell Avenue, Suite 1018, carried the proceeds of a fraud on another bank's customer, and that the recipient of those proceeds was a wrongdoer and not an innocent payee.

84. On July 21, 2023, Truist reported the fraud to Chase, identified the July 20 Wire as its proceeds and requested the return of the funds. Chase told Truist the same day that it would need its customer's authority to debit the funds, and it did not return them on that request.

85. Truist's communications with Chase concerned the fraud through Cadena's accounts, including the Trust's funds that Cadena had wired to Oceanview.

86. Truist and Chase remained in communication about the fraud through July 24, 2023.

87. By July 21, 2023, $360,000 of the Trust's funds had been in the Oceanview account at Chase for a week.

88. When Chase judged the July 20 Wire fraudulent and restricted Carnoustie's account, Chase's own records of the July 14 Wire showed that, six days earlier, Chase had received and credited to Oceanview a $360,000 wire from the same sending bank, from an originator at the same address, 20446 S. Dixie Highway, with the same stated purpose, "REAL ESTATE INVESTMENT," for a beneficiary at the same address, 1441 Brickell Avenue, Suite 1018.

89. From its own fraud finding and its own records, Chase knew, before the afternoon of July 24, 2023, that the $360,000 credited to Oceanview on July 14 had come through the same sending bank, from an originator at the same address and under the same stated purpose as the wire its fraud unit had judged fraudulent, that the person behind the originator address was Chase's own customer, and that Oceanview was operated together with the account Chase had restricted as a wrongdoer's.

***Chase's Fraud Alert on the July 24 Wire, Its Decline, and Its Override.***

90. On July 24, 2023, Oceanview submitted through Chase's online banking system a wire of $340,000 to an account ending in 5794 at First Horizon, the trust account of the Law Offices of Bennett S. Cohn in Lake Worth Beach, Florida, with the reference "EDUARDO DANIEL SINAGRA" (the "July 24 Wire").

91. Oceanview had never sent funds to that payee before.

92. The July 24 Wire tripped Chase's fraud controls. Chase's wire-alert system held the wire for review with the stated reason "Wire – Suspicious online activity present – Confirm no ATO before approving," that is, to confirm that the wire had not been initiated by someone who had taken over Oceanview's account.

93. Chase's first reviewer approved the wire on the ground that the payee was a law firm and sent it to secondary review. The reviewer recorded that the funds in the account came from the "07/14/2023 Wire Transfer FEDWIRE CREDIT VIA: TRUIST BAN[K]," and skipped the review of the online activity that had generated the alert.

94. Chase's secondary reviewer declined the wire. The reviewer recorded that the payee's ownership of the receiving account was "Not established/verified," that no link between Oceanview and the payee was established, that the online "red flags" could not be resolved, that

there was "no good number to call" the customer, and that the funds in the account came from the "07/14/2023 Wire Transfer FEDWIRE CREDIT VIA: TRUIST BAN[K] 360,000.00." The recorded decision was "Declined."

95. The wire was then resubmitted and a third Chase reviewer approved it, recording an "Unjustified" velocity of transactions, the same July 14 Truist wire as the source of the funds, and the conclusion "Approved :- Link and ownership on the acc EIV and Law firm cc did verify the transfer as valid."

96. A fourth reviewer gave final approval, recording: "Sending to est law firm. Ownership in EIV. Funds verified."

97. No Chase reviewer recorded any contact with Oceanview's signer.

98. The online-activity review that had recorded the Uruguayan internet IP address on Oceanview's other wires was skipped.

99. Chase's procedures allowed that review to be skipped when the payee was a law firm, and Chase applied that exception to the July 24 Wire.

100. Chase reversed its own decline on the ground that the payee was an established law firm.

101. Nothing about the account, the customer, the funds or the online activity changed between the decline and the approval. Each reviewer recorded the same balance and the same source. The payee's status went to whether the wire was Oceanview's own instruction. It answered none of the questions Chase's own reviewers had recorded and left open: the online activity that had generated the alert, the customer who could not be reached, and the source of the funds they had written down.

102. A lawyer's trust account holds the money of the lawyer's clients and third persons, not the lawyer's own. The reference on the July 24 Wire named the person for whom the money was sent. Chase's verification that the receiving account belonged to a law firm established nothing about the source of the funds or Oceanview's right to send them.

103. Eduardo Daniel Sinagra was not Oceanview's signer, and Chase's account-opening file identified no connection between him and Oceanview.

104. The July 24 Wire was a payment of the kind Chase knew these accounts to make: money that had come into the account from someone else, sent out for the benefit of a third person named in the reference.

105. On July 24, 2023, Chase knew whose money it was. Chase's own fraud unit had found four days earlier that the money coming into the sister account from the same Truist customer under the same label was stolen, First Horizon had told Chase so, Truist had reported the fraud to Chase and communicated with Chase about the Trust's funds in the Oceanview account, and Chase's own records showed that the $360,000 had come through the same channel six days before the wire Chase had judged fraudulent.

106. Chase executed the July 24 Wire at 5:23 p.m.

107. The July 24 Wire removed $340,000 of the $346,340.59 then in the account and left $6,315.59.

***Chase's Treatment of the Account It Did Restrict.***

108. Chase treated Carnoustie's account as its fraud finding required and on July 28, 2023, Chase debited the entire balance and closed the account.

109. After Chase restricted Carnoustie's account, Carnoustie pressed Chase to release the $432,000 to it as Carnoustie's own money, and it continued to do so through January 2024. Chase did not release the funds.

110. Chase returned the $432,000 to Truist on October 16, 2023, for the benefit of Ms. Donnelley and Mr. Stockham.

111. Chase never restricted the Oceanview account, however.

112. Had Chase restricted it on July 20, 2023, or at any time before 5:23 p.m. on July 24, 2023, as it restricted Carnoustie's account, the Trust's funds would have been held and returned, as Ms. Donnelley's and Mr. Stockham's were.

113. Chase did not lack the information to restrict the Oceanview account. Chase's own records tied the account to the account it had restricted and to the wire it had judged fraudulent, Truist had communicated with Chase about the Trust's funds in the account, and Chase's fraud unit had the account's outgoing wire in front of it on July 24, 2023.

114. Chase's failure to restrict the Oceanview account was not attributable to a lack of scrutiny. To the contrary, Chase's fraud unit reviewed a wire transfer from the account on July 24, 2023, stopped and declined the transaction, yet proceeded to release it later on.

***The Loss.***

115. The $340,000 was credited to attorney B. Cohn's trust account at First Horizon on July 24, 2023, and disbursed from that account over the following weeks. The remaining funds in the Oceanview account following the July 24 Wire were subsequently dissipated through additional transactions.

116. All conditions precedent to this action have been performed, have occurred, or have been waived or excused.

## CAUSES OF ACTION

### COUNT I – AIDING AND ABETTING CONVERSION

117. Plaintiff realleges and incorporates by reference paragraphs 1 through 116 above as if fully set forth herein.

118. The Trust's $450,000 was specific and identifiable property of the Trust. It was wired at one time, by one act and in one sum, from the Trust's account into an account controlled by Cadena at Truist.

119. It was traced by Truist, and by Chase's own records, through the Cutler Bays account into the Oceanview account, where the July 14 Wire was the source of substantially the entire balance between July 14 and July 24, 2023.

120. The Hacker, Cadena, Cutler Bays, Oceanview and the persons who controlled Oceanview (collectively, the "Primary Wrongdoers") converted the Trust's funds.

121. The Hacker obtained possession of the funds by fraud and without the Trust's consent.

122. Cadena and Cutler Bays exercised dominion over them by moving them out of the Cutler Bays account, including by the July 14 Wire.

123. Oceanview and the persons who controlled it exercised dominion over them by holding them and by transferring $340,000 of them to the Cohn trust account on July 24, 2023, with the reference "EDUARDO DANIEL SINAGRA."

124. Oceanview had no legitimate business, and none of the money in the account was the product of one.

125. Each of those acts was inconsistent with the Trust's ownership of the funds and its immediate right to possess them, and none was authorized by Plaintiff.

126. Chase had actual knowledge of the Primary Wrongdoers' conversion when it executed the July 24 Wire.

127. When it executed the July 24 Wire, Chase knew that the funds it was releasing were stolen and that Oceanview had no right to send them.

128. Chase's knowledge was actual. It consisted of Chase's own fraud finding of July 20, 2023, Chase's own records of the July 14 Wire and of the two accounts, Truist's communications with Chase, and Chase's own reviewers' notes of the source of the funds they released. It did not depend on inquiry, on inference from warning signs, or on what a careful bank would have learned, and it did not depend on any alert on the July 14 Wire itself. The reviewers wrote down a source Chase had already identified as fraudulent and had already been told about.

129. The fraud Chase identified on July 20, 2023 was part of the scheme described in paragraphs 49 and 50, and the July 14 Wire was another known part of it.

130. Chase's reviewers knew, and wrote down, that the funds they were releasing on July 24, 2023 were the proceeds of the July 14 Wire.

131. The knowledge that Chase's fraud analysts, anti-money-laundering personnel and wire reviewers acquired in the course of their duties is Chase's knowledge. Each of them acted within the scope of his or her duties, and the July 20 fraud finding, the July 24 anti-money-laundering directive and the July 24 review were all made within Chase's fraud and compliance functions.

132. Chase knew that its release of the July 24 Wire was part of the improper activity its own fraud unit had identified four days earlier. Chase was, at the least, generally aware of that.

133. Chase's knowledge preceded its act, as Chase judged the July 20 Wire fraudulent on July 20, 2023, and released the Trust's funds from the sister account on July 24, 2023.

134. Chase substantially assisted the conversion by executing the July 24 Wire, and it did so by reversing its own fraud unit's decline of that wire, without contacting its customer and without the online review its own alert called for, on the ground that the payee was a law firm.

135. The execution of the wire was the act by which $340,000 left the one account in which the Trust's funds could still have been held and recovered.

136. Without Chase's execution of the wire, the conversion of those funds could not have been completed.

137. As a direct and proximate result of Chase's knowing and substantial assistance, the Trust lost the funds Chase released, in an amount of $340,000, together with interest from July 24, 2023.

138. Chase is jointly and severally liable with the Primary Wrongdoers for the damages caused by the conversion it assisted.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment against Defendant JPMorgan Chase Bank, N.A. on Count I;

B. Award Plaintiff compensatory damages in the amount of $340,000, or such other amount as is proven at trial;

C. Award pre-judgment interest from July 24, 2023, and post-judgment interest as permitted by law;

D. Award Plaintiff his costs; and

E. Award such other and further relief as the Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

Plaintiff demands a trial by jury on all issues so triable.

DATE: November 23rd, 2026

Respectfully submitted,

**SALTIEL LAW GROUP**
*Counsel for Plaintiff*
201 Alhambra Circle, Suite 1050
Coral Gables, Florida 33134
Phone: 305.735.6565

By: */s/ Victor M. Arca Rojas*
Victor M. Arca Rojas, Esq.
Florida Bar Number: 1014225
Email(s): Victor@saltiellawgroup.com;
Service@saltiellawgroup.com